## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

| | | |
|---|---|---|
| **BARRY RICHARD HUDNALL, JR.,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 2:14-25547** |
| | ) | |
| **CAROLYN. W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| **Defendant.** | ) | |

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Standing Orders entered October 10, 2014 and January 5, 2016 (Document Nos. 4 and 16.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings (Document Nos. 13 and 14.), and Plaintiff's Response. (Document No. 15.)

The Plaintiff, Barry Richard Hudnall, Jr. (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on August 9, 2011 (protective filing date), alleging disability as of August 30, 2009, due to lung problems, asthma, and trouble hearing. (Tr. at 16, 221-24, 225-31, 244, 248.) The claims were denied initially and upon reconsideration. (Tr. at 97-105, 106-14, 115-16, 117-28, 129-40, 141-42, 143-45, 148-50.) On July 6, 2012, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 162-63.) A hearing was held on May 29, 2013, before the Honorable I. K. Harrington. (Tr. at 31-69.) By decision dated July 11, 2013, the ALJ

determined that Claimant was not entitled to benefits. (Tr. at 16-27.) The ALJ's decision became the final decision of the Commissioner on July 24, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) Claimant filed the present action seeking judicial review of the administrative decision on September 8, 2014, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2013). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth

2

and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.   20 C.F.R. §§ 404.1520(f), 416.920(f) (2013). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, August 30, 2009. (Tr. at 18, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "emphysema, a dysthymic disorder, and borderline intellectual functioning," which were severe impairments. (Tr. at 18, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 19, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity for medium work, as follows:

> [C]laimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except he is limited to moderate exposure to noise (i.e. business office with typewriters in use, department stores, grocery stores, light traffic, and fast-food restaurants at off hours). The [C]laimant must avoid direct exposure to fumes, dust, gases, odors, and areas of poor ventilation. The [C]laimant must also avoid concentrated exposure to unprotected heights and dangerous moving machinery. The [C]laimant is limited to simple, routine tasks, and superficial interaction with groups, including no tandem tasks. Further, the [C]laimant is limited to occasional interaction with supervisors, but no "over the shoulder supervision," and no requirement to read or write reports.

(Tr. at 21-22, Finding No. 5.) At step four, the ALJ found that Claimant was unable to perform his past relevant work. (Tr. at 26, Finding No. 6.) On the basis of testimony of a Vocational Expert

("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a stocker, grader/sorter, at the unskilled, light level of exertion, and as a bench worker and hand packer, at the unskilled, sedentary level of exertion. (Tr. at 26-27, Finding No. 10.) On this basis, benefits were denied. (Tr. at 27, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on November 4, 1963, and was 49 years old at the time of the administrative hearing on May 29, 2013. (Tr. at 26, 221, 225, 283.) The ALJ found that Claimant had a limited education and was able to communicate in English. (Tr. at 26, 247, 249.) In the past,

he worked as a welder and a laborer. (Tr. at 26, 249.)

 The Medical Record

The Court has considered all evidence of record, including the medical evidence and will summarize it and discuss it below.

On January 9, 2012, Claimant was evaluated by Kara Gettman-Hughes, M.A., at the request of the State Disability Determination Service ("DDS"). (Tr. at 309-17.) Claimant stated that he was unable to work due to functional problems from his lung condition, emotional distress, and cognitive deficits. (Tr. at 310.) He reported frequent headaches, memory deterioration over the past several years, feelings of sadness, loss of interest in activities, impaired sleep, feelings of guilt and failure, crying spells, angry and irritable very easily, and worry. (Id.) He also reported auditory hallucinations for the past several months. (Id.) Claimant stated that he had an eighth grade education and took special education classes for all subjects when in school. (Id.) He had never received any mental health treatment and was not taking any medications for physical or mental impairments. (Tr. at 311.)

Results of the WAIS-IV revealed that Claimant's cognitive ability was in the extremely low range of intellectual functioning as measured by his full scale IQ score of 58. (Tr. at 311.) Results of the WRAT-4 revealed that Claimant performed reading and math at a second grade level and spelled at a first grade level. (Tr. at 312.) Both these test results were considered invalid however, because Claimant put forth little effort during the evaluation and failed to use the allotted time for task completion. (Tr. at 311-12.)

Ms. Gettman-Hughes noted that Claimant was very laconic throughout the interview, appeared irritable, was a poor historian, and appeared disheveled with poor hygiene. (Tr. at 310, 313.) Mental status exam revealed poor eye contact, responsive and coherent speech, full

orientation except to the exact date, irritable mood and restricted affect, understandable and connected thought processes, poor insight and judgment, prior suicidal and homicidal ideation, intact immediate memory, moderately impaired recent memory and persistence, poor remote memory and concentration, slow pace, and severely impaired social functioning based on the evaluation. (Tr. at 313.) Ms. Gettman-Hughes diagnosed mood disorder NOS and psychotic disorder NOS. (Tr. at 314.) She noted Claimant daily activities to have included running errands, visiting family and friends, hunting, attending medical appointments, and performing self-care with assistance. (Id.) He did not do any house or yard work. (Id.) Ms. Gettman-Hughes opined that Claimant's prognosis was poor and possibly would require assistance managing his funds. (Id.)

On January 17, 2012, Claimant was evaluated by Dr. Kip Beard, M.D., at the request of DDS. (Tr. at 318-27.) Claimant reported that he was unable to afford treatment due to a lack of medical insurance. (Tr. at 318, 322.) He complained of a productive, chronic cough with wheezing, intolerance to cold conditions, and dyspnea on exertion after 50 or 60 yards on level surface. (Tr. at 318.) He reported that he smoked five or six cigarettes per day. (Tr. at 318-19.) Claimant reported that he had never had any pulmonary function testing and was not taking any medication for his lungs. (Tr. at 318.) Claimant also reported continued headaches, leg numbness, and some hearing difficulty. (Tr. at 319.)

On physical exam, Dr. Beard noted that Claimant was underweight, ambulated without any assistive devices and was able stand unassisted, and spoke understandably and was able to follow instructions without difficulty. (Tr. at 320.) Dr. Beard noted some distant breath sounds, some mild rhonchi, a prolonged expiratory component, and some mild exertional dyspnea. (Id.) His impression was asthma/emphysema, occupational asbestos exposure without evaluation, and diminished hearing according to history. (Tr. at 321.) Dr. Beard noted that Claimant had not

required any hospitalizations for his conditions. (Tr. at 322.) Pulmonary Function Testing revealed moderate COPD, without improvement after bronchodilation. (Tr. at 324.)

Claimant initiated treatment at Cabin Creed Health Systems on April 25, 2012, and complained of headaches for seven months and back and leg pain for two months. (Tr. at 328, 332, 341.) Claimant's physical examination was unremarkable and Byron Hoggatt, R.N./F.N.P-B.C., noted that Claimant's lungs were clear and there was adequate inspiratory effort. (Tr. at 328-29, 332-33, 341-42.) Mr. Hoggatt diagnosed chronic headache b/o without photophobia and acute left knee pain. (Tr. at 329, 333, 342.) On July 6, 2012, Claimant returned for a follow-up regarding obstructive chronic bronchitis, with an onset of June 2012, and an FEV1 of 48%; joint effusion of the left leg; and being underweight. (Tr. at 335, 344.) Physical exam was normal with the exception of left knee effusions and limited extension due to pain. (Id.) Mr. Hoggatt prescribed Naproxen, Prednisone, and an Albuterol inhaler. (Tr. at 336, 345.) Pulmonary function testing revealed a FEV1 of forty-eight percent. (Tr. at 331, 335, 337, 344, 346.) The x-rays of Claimant's knees indicated suprepatellar knee joint effusion of the left knee. (Tr. at 335, 338-39, 345, 347-48.)

On August 22, 2012, Claimant reported that the Naproxen did not help his knee, although the prednisone did. (Tr. at 349.) Claimant further reported a non-productive cough and dyspnea. (Id.) Physical exam and mental status was unremarkable, with the exception of left knee tenderness of the right lateral aspect, no effusions and a medial posterior nodule. (Id.) Claimant's lungs were normal, clear, and with adequate inspiratory effort. (Id.) Mr. Hoggatt assessed acute left knee pain, resolving; COPD with PeakFlow of thirty-eight percent with Spiriva and Advair; and a BMI of less than 18.5, without change for two months. (Tr. at 350.) On November 7, 2012, Mr. Hoggatt again noted that Claimant's lungs were normal, clear, and with adequate inspiratory effort. (Tr. at 351.) PFT revealed a FEV1(L) of 1.31, which was thirty-nine percent predicted value, and which

was classified as severe obstruction. (Tr. at 352, 354.) A second test on November 7, performed approximately an hour later, revealed a FEV1 of 1.62, or thirty-three percent, which was severe obstruction. (Tr. at 355.)

Claimant returned to Mr. Hoggatt on December 7, 2012, and complained of re-injury to his left knee when he swept away brush with his left foot when it got hung up and he was unable to kill a deer. (Tr. at 356.) Physical exam revealed that Claimant's lungs were clear to auscultation but was diminished bilaterally in the base. (Id.) His left lower extremity revealed 4/5 strength and it was noted the Claimant walked with a cane. (Tr. at 357.) Mr. Hoggatt assessed acute left knee pain, reinjured and COPD Stage II, with a FEV1(L) of 1.62, or forty-eight percent predicted value, which remained classified as "severe." (Tr. at 357-58.)

On March 14, 2013, Claimant returned to Mr. Hoggatt for follow-up examination and reported that he was unable to sleep since his sister passed away on February 28. (Tr. at 374.) Physical exam and mental status exams were unremarkable and Mr. Hoggatt assessed COPD, Stage III with a FEV1(L) of 1.65, or forty-nine percent predicted value, and depression and anxiety due to grieving. (Tr. at 375, 378.) At Mr. Hoggatt's request, Claimant met with Adrienne Fitzsimmons, for a new patient behavioral health consult on differential between depression and grieving. (Tr. at 376-77.) Claimant reported that law enforcement advised him that his sister may have been murdered, and therefore, it was an unexpected death. (Tr. at 376.) Claimant stated that he was close to his sister. (Id.) He also reported that he spent the day in his building doing carpentry, and was having difficulty sleeping. (Id.) He reported symptoms of depression with a one year history which worsened after his sister was murdered, to include feelings of sadness, appetite loss, isolation, and sleep difficulties. (Id.) He stated that he disliked being around people and that large groups of people made him nervous. (Id.) He also reported that he felt anxious most

8

of the time, even when he was alone. (Id.) Mental status exam revealed that Claimant was appropriate, maintained limited eye contact, had a dysthymic mood and congruent affect, limited sleep, reduced appetite, and low energy. (Tr. at 377.) Ms. Kelly provided Mr. Hoggatt with her information to make further determinations regarding treatment. (Id.)

On March 15, 2013, Sheila Emerson Kelly, M.A., a licensed psychologist, conducted a psychological evaluation, at the request of Claimant's attorney. (Tr. at 360-73.) Claimant reported that he last worked for a subcontracting company that provided services to Donaldson Mining Company, where he was fired after six months because he kept getting lost. (Tr. at 360.) Claimant reported his daily activities to have included receiving visits from a friend when in a good mood, making coffee, watching television, listening to the radio, hunting from his truck with a special license, taking out the trash, occasionally fishing in the river, playing poker "every now and then" with his father and friends, whittling or carving wood, and sometimes driving out in the woods. (Tr. at 364-65.) Ms. Kelly noted that Claimant's COPD significantly limited his physical activity. (Tr. at 367.) Mental status exam revealed that Claimant was cooperative, had noticeable hearing difficulty, and presented with a normal mood. (Tr. at 365.) Testing revealed a full scale IQ score of 75, which fell in the borderline range of intellectual ability. (Tr. at 366.) The WRAT-4 revealed that Claimant read at a second grade level and performed math at a fifth grade level. (Tr. at 367.) Regarding social functioning, Ms. Kelly noted that Claimant had a difficult personality because he was irritable, easily angered, rather rude when provoked, and prone to authority problems. (Tr. at 368.) She diagnosed passive aggressive and avoidant personality traits; probable personality disorder NOS, borderline intellectual functioning, rule out social phobia, rule out chronic dysthymic disorder, and rule out alcohol abuse and possible dependence. (Id.) She opined that due to Claimant's intellectual ability, poor reading, and irascible personality, he was an "unlikely

9

candidate for any position requiring interaction with the public or extensive cooperation and collaboration with co-workers and supervisors." (Id.) She further opined that he most likely would not pass a GED examination and that his health problems "would be an additional limiting factor for an employer." (Id.)

On May 20, 2013, Mr. Hoggatt completed a form Medical Questionnaire, on which he reported that he had treated Claimant every one or two months since April 2012. (Tr. at 380-81.) Mr. Hoggatt stated that Claimant had been diagnosed with COPD, as established by PFT and anxiety and insomnia, as established by a behavioral health consult. (Tr. at 380.) He noted Claimant's pulmonary symptoms to have included shortness of breath, chest tightness, episodic acute bronchitis, production of excess mucus, lack of sex drive, orthopnea, coughing, forgetfulness, fatigue, episodic pneumonia, insomnia, restlessness, unexplained weight loss, increased morning headaches, increased persistent feelings of fatigue and lack of energy, and use of more pillows when sleeping. (Tr. at 381.) Mr. Hoggatt noted that emotional factors contributed to Claimant's symptoms and functional limitations. (Tr. at 380.) He also noted that Claimant's medications caused drowsiness. (Id.) He opined that Claimant's chronic COPD may respond to pulmonary rehabilitation and that a psychological evaluation was needed for his anxiety and insomnia. (Id.) Mr. Hoggatt further opined that Claimant could walk half a block without rest, required unscheduled breaks during an eight-hour working day, and required breathing treatments throughout the day. (Tr. at 381.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to analyze properly the severity of Claimant's COPD. (Document No. 13 at 8-11.) Claimant asserts that the ALJ failed to mention in her decision any of Claimant's PFTs

and gave great weight to the opinions of Drs. Lauderman and Gomez, whose opinions were rendered prior to the creation of the majority of relevant evidence, including his diagnosis of severe COPD, with PFT results below 2.00(L). (Id. at 8-9.) Claimant asserts that the ALJ erred in disregarding Mr. Hoggatt's opinion because he was the only source who reviewed the entire record. (Id. at 9-10.) Contrary to the ALJ's finding, Claimant asserts that his daily activities "are in fact *de minimus* at best." (Id. at 10.) Claimant notes that Witness Brian Rider testified that when Claimant worked part-time, he was off task approximately fifty percent of the time. (Id.) Claimant further asserts that the ALJ failed to consider the impact of his severe COPD on his ability to walk, lift, and carry, as evidenced by the deficient hypothetical questions to the VE. (Id. at 10-11.) She also failed to consider the impact of Claimant's severe COPD on his ability to complete an eight-hour workday without unscheduled breaks or with being off task due to associated symptoms. (Id. at 11.)

In response, the Commissioner first asserts that Claimant's admitted daily activities, which included making walk sticks for friends, doing light construction work, working as a gopher or runner, and sweeping and cleaning up, belied his alleged severity of his symptoms. (Document No. 14 at 11.) The Commissioner points out that Claimant smoked cigarettes on a daily basis, though his reports of the number of cigarettes smoked varied throughout the record. (Id.) Nevertheless, he testified to having smoked two packs per day through March 2013, when he reduced to two cigarettes a day. (Id.) Second, the Commissioner asserts that the treatment and clinical evidence did not support the alleged severity of Claimant's symptoms. (Id. at 12.) She notes that Claimant did not require hospitalization for his breathing issues and Dr. Beard assessed only mild abnormalities. (Id.) Third, the Commissioner asserts that the opinions of Drs. Lauderman and Gomez conflicted with Claimant's allegations. (Id.) Although these physicians did not have

11

access to the entire medical record, the ALJ considered the whole record and her decision is supported by substantial evidence. (Id. at 12-13.) Fourth, and finally, the Commissioner asserts that although Dr. Hoggatt's opinion was the only evidence that supported Claimant's allegations, the ALJ noted that it was a fill-in-the blank and check-the-box form and was submitted by an "other source," a nurse practitioner, which in view of the totality of the evidence, was only of limited probative value. (Id.) The Commissioner notes that although the ALJ assessed a medium level RFC, the VE identified jobs at the sedentary exertion level that Claimant was capable of performing. (Id.)

Claimant responded that the Commissioner failed to explain or defend the ALJ's failure to mention or reconcile the severe PFTs in her decision. (Document No. 15 at 1.) Although the Commissioner asserts that the ALJ considered the evidence in addition to that considered by Drs. Lauderman and Gomez, Claimant contends that the ALJ mentioned in her decision only the moderate level of COPD and PFT by Dr. Beard. (Id. at 2.) The Commissioner therefore, attempted to engage in a post hoc analysis to demonstrate that examination findings essentially were normal and ignored the severe level of COPD as evidenced by the PFTs. (Id.)

Claimant next alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ did not weigh the evidence properly. (Document No. 13 at 11-13.) Claimant asserts that the ALJ erred in failing to assess limitations associated with his mood and psychotic disorders, as assessed by Dr. Gettman-Hughes, when the ALJ accorded her opinion substantial weight. (Id. at 11-12.) Claimant asserts that the ALJ selectively chose portions of Dr. Gettman-Hughes' opinion that fit her RFC and either misstated the remainder of her report or found that it was contrary to her RFC finding. (Id. at 12.) For example, Claimant notes that the ALJ found his social functioning was moderately deficient and specifically cited to Dr. Gettman-

Hughes' opinion, despite her assessment of severely limited social functioning. Furthermore, Dr. Gettman-Hughes opined that Claimant's concentration was poor and his persistence was moderately impaired, and her assessment was consistent with Brian Rider's testimony and the findings of Ms. Kelly. (Id.) The ALJ however, assessed only moderate deficiencies in maintaining concentration, persistence, or pace. (Id.) Finally, Claimant notes that the ALJ ignored the VE's testimony that if he lacked sufficient concentration, persistence, or pace for simple, routine tasks for forty hours per week, then work was not available to him. (Id. at 13.)

In response, the Commissioner asserts that Claimant's allegations that the ALJ disregarded diagnoses related to his mental status are without merit. (Document No. 14 at 14.) The Commissioner asserts that the ALJ followed counsel's lead at the hearing, where counsel conceded that although Claimant had different diagnoses from different consultants for his mental impairments, they "get to the same place basically." (Id.) Consequently, the fact that the ALJ did not identify every mental impairment as a severe impairment at step two does not present reason for remand. (Id.) The Commissioner asserts that the evidence of Claimant's mental health issues was relatively benign. (Id. at 15.) She further asserts that the credible opinion evidence supported the ALJ's mental RFC. (Id. at 16.) The ALJ gave substantial weight to the opinion of Dr. Allen, who relied upon the opinion of Ms. Gettman-Hughes. (Id. at 16-17.) The ALJ therefore, considered the clinical findings of Ms. Gettmamn-Hughes. (Id. at 17.) The Commissioner further asserts that the ALJ appropriately considered the clinical evidence in Ms. Kelly's report, which supported her RFC. (Id.) Ms. Kelly found that Claimant's concentration was not a problem during testing and described Claimant as a difficult person prone to authority problems. (Id.) The ALJ therefore, limited Claimant to simple, routine tasks that did not involve reading and writing and significantly limited his need to interact with co-workers and supervisors. (Id.) Finally, the Commissioner

13

asserts that Claimant engaged in many daily activities that required him to exhibit concentration, persistence, and pace, and function socially. (Id. at 18.) These activities included hunting, fishing, playing cards, watching television, making walking stick, and performing light construction work. (Id.) Accordingly, the Commissioner contends that substantial evidence supports the ALJ's RFC finding. (Id.)

Finally, Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in weighing the testimony of lay witness, Brian Rider. (Document NO. 13 at 13-16.) Claimant asserts that the ALJ should not have dismissed Mr. Rider's testimony simply because it was consistent with Claimant's allegations. (Id. at 14-15.) He notes that the ALJ dismissed his testimony because she found Claimant not entirely credible. (Id. at 15.) To this extent, Claimant asserts that the ALJ reached to find him not credible. (Id.) He contends that the reasons cited by the ALJ for discrediting Claimant's testimony were not substantiated by the record. (Id. at 16.)

In response, the Commissioner asserts that the ALJ properly found that Mr. Rider's testimony was similar to Claimant's testimony, and therefore, was only as reliable as Claimant's testimony. (Document No. 14 at 18-19.) Citing this Court's decision in Goad v. Astrue, 2008 WL 644881, at *1 (S.D. W.Va. Mar. 7, 2008), the Commissioner contends that the ALJ is entitled to dismiss lay testimony without specific reasons when it repeats the claimant's allegations and is contradicted by the same objective evidence that contradicted the claimant's testimony. (Id.) In this instance, the ALJ found that Claimant's subjective allegations were not entirely credible, and therefore, the ALJ's finding that Mr. Rider's testimony was not entirely credible likewise is supported by substantial evidence. (Id. at 19.) Citing Crosby v. Barnhart, 98 Fed.Appx. 923, 925, Claimant asserts in response that an ALJ may not reject evidence "for no reason or for the wrong

14

reason."

Pursuant to SSR 96-3p, Claimant asserts that for an impairment to be a non-severe impairment, it must be a slight abnormality that has no more than a minimal effect on the ability to perform basic work activities. (Id. at 16.) Claimant contends that because the ALJ found that his tremors were a non-severe impairment, the condition presumptively was a medically determinable impairment, and therefore, it was determinative upon the evidence, as to its severity. (Id. at 16-17.) Claimant relies upon Dr. Goldfarb's findings that the tremors were "very apparent" upon finger-nose-finger testing as evidence of a severe impairment. (Id. at 17.) Furthermore, he notes his testimony that the tremors were worse with fine motor activity, which was consistent with Dr. Goldfarb's observations. (Id.) Claimant notes that the VE testified that most sedentary jobs required only occasional use of the hands and required public contact.  (Id. at 17-18.) The combination of occasional manipulative limitations with no public contact would eliminate all sedentary level jobs pursuant to the VE's testimony. (Id. at 18.) Claimant therefore asserts, that had the ALJ found his tremors to have been a severe impairment, the limitations would have had a significant impact on the ALJ's findings at step five. (Id.)

In response, the Commissioner asserts that the record demonstrated that Claimant's hand tremors failed to cause significant functional limitations, and therefore, were not a severe impairment. (Document No. 11 at 5-7.) The Commissioner asserts that the ALJ's severity finding and explanation is consistent with the record. (Id. at 6.) The Commissioner first notes that Claimant failed to make any mention of any difficulties with his hands or with reaching when he applied for benefits. (Id.) Next, the Commissioner notes that Dr. Goldfarb described his condition as only slight and mild. (Id.) Dr. Beard, likewise observed an absence of atrophy and noted that Claimant was able to button and pick up coins with both hands, was able to write with his dominant hand

15

without difficulty, had normal range of motion testing, and did not exhibit any muscle weakness. (Id.) Furthermore, the Commissioner notes Claimant's activities to have included working on his antique car, repairing bikes, sweeping floors, cooking a little, and washing dishes. (Id.) Accordingly, the Commissioner asserts that the ALJ's decision is supported by substantial evidence. (Id. at 6-7.)

Analysis.

1. Physical RFC Assessment.

Claimant first alleges that the ALJ erred in assessing the severity of his COPD. (Document No. 13 at 8-11.) "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2013). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

In her decision, the ALJ determined that Claimant was capable of performing medium level work that allowed him, *inter alia*, to avoid direct exposure to fumes, dust, gases, odors, and areas

of poor ventilation. (Tr. at 21.) In reaching this decision, the ALJ gave great weight to the opinions of Drs. Lauderman and Gomez, the State agency medical consultants, because their opinions were consistent with the objective medical evidence. (Tr. at 25.) She gave limited probative value to the opinion of Mr. Hoggatt because he was not an acceptable medical source and because his opinion was inconsistent with the other opinion evidence and with Claimant's "varied and robust" daily activities. (Id.) Claimant takes issue with the weight given to the opinions of Drs. Lauderman and Gomez however, because they did not consider the results of the PFTs administered subsequent to their opinions. As the Commissioner notes, an ALJ may rely on opinions from consultants who did not have access to the entire medical record when the ALJ considers the entire evidentiary record. See McAbee v. Colvin, 2014 WL 7369510, *12 (D. S.C. Dec. 29, 2014).

In this case however, it is not clear that the ALJ considered the entire evidentiary record. She made no reference to the various results of the PFTs and she failed to acknowledge the extent of Claimant's treatment at Cabin Creed Health Systems with Mr. Hoggatt. Though she considered Mr. Hoggatt's opinion, there is little reference or consideration given to his treatment, that contained Claimant's subjective reports, objective findings, and PFT results. In assessing Claimant's COPD, the ALJ noted Dr. Beard's report of only mild exertional dyspnea and a Ventilatory Function Report that revealed an absence of bronchospasm or acute respiratory illness. (Tr. at 23.) Dr. Beard noted that Claimant never had been hospitalized for his breathing problems. (Tr. at 24.) Dr. Hoggatt noted that Claimant had smoked for a number of years, with the number of cigarettes per day varying between two and six. (Tr. at 24.) The ALJ concluded that Claimant's ongoing tobacco use, belied his pulmonary symptoms. (Id.) The ALJ proceeded to consider Claimant's daily activities, as well. Nevertheless, in view of the ALJ's failure to acknowledge the results of the various PFTs and the treatment records from Mr. Hoggatt, the undersigned finds that

this matter should be remanded for further consideration of Claimant's physical RFC.

2. Mental RFC.

Claimant next alleges that the ALJ did not weigh properly the evidence as to her mental functioning. (Document No. 13 at 11-13.) Claimant asserts that although the ALJ gave substantial weight to the opinion of Ms. Gettman-Hughes, she failed to acknowledge that Ms. Gettman-Hughes diagnosed mood and psychotic disorders, in addition to the dysthymic disorder and BIF that the ALJ found as severe impairments. (Id. at 11.) The Claimant therefore contends that the ALJ "picks and chooses" the portions of Ms. Gettman-Hughes' opinion that fit her RFC. (Id. at 12.) The undersigned finds that although the ALJ did not find specifically at step two of the sequential process that Claimant had severe impairments of mood and psychotic disorders, the remainder of her opinions clearly indicates that she considered all the functional limitations resulting from Claimant's mental impairments. (Tr. at 20-21, 23-26.) Although Claimant asserts that the ALJ failed to consider the limitations resulting from the additional impairments, he fails to identify any such limitation.

Claimant also takes issue with the ALJ's assessment that Claimant's social functioning was moderately deficient. (Document No. 13 at 12.) In her decision, the ALJ noted that Claimant easily was angered and irritated, was fired from a job due to his temper and personality, and visited family and friends daily. (Tr. at 20.) Claimant asserts that the ALJ ignored the opinion of Ms. Gettman-Hughes that he had severely deficient ability to maintain social functioning. Though the ALJ did not state specifically Ms. Gettman-Hughes' finding in this respect, she noted further functions in which Claimant engaged, including hunting from his truck, fishing, playing cards, making walking sticks for others, and doing odd jobs for a construction friend. (Tr. at 23.) These functions and activities lend further support that his ability to function socially was not as limited as Ms.

Gettman-Hughes found, despite the ALJ's failure to address it. The ALJ accommodated any limitation in social functioning by limiting Claimant's need to interact with co-workers and supervisors.

Claimant further takes issue with the ALJ's finding that he had only moderate limitations in maintaining concentration, persistence, or pace. (Document No. 13 at 12.) Ms. Gettman-Hughes determined that Claimant had poor concentration, slow pace, and moderately impaired persistence. (Tr. at 313.) These conclusions are not entirely inapposite to the ALJ's findings and are accommodated by the ALJ's limitation to simple, routine tasks with no reading or writing requirement. Accordingly, the undersigned finds that the ALJ's decision in this regard is supported by substantial evidence.

3.  <u>Witness Opinion</u>.

Finally, Claimant alleges that the ALJ erred in weighing the testimony of lay witness, Brian Rider. (Document No. 13 at 13-16.) Title 20, C.F.R., sections 404.1512(a); 416.912(a) provide in part that the Commissioner "will consider only impairment(s) you say you have or about which we receive evidence." 20 C.F.R. § 416.912(a) (2013). Evidence is defined as "anything you or anyone else submits to us . . . [including] (4) Information from other sources, as described in § 416.913(d)." 20 C.F.R. §§ 404.1512(b); 416.912(b) (2013). Evidence from other sources may be used to show the severity of a claimant's impairment and may come from "[o]ther non-medical sources (for example, spouses, parents and other care-givers, siblings, other relatives, friends, neighbors, and clergy)." 20 C.F.R. §§ 404.1513(d)(4); 416.913(d)(4) (2013). When an ALJ does not accept lay testimony as true, regarding a claimant's allegations, the ALJ is required to discuss specifically the testimony and make explicit credibility determinations. <u>Morgan v. Barnhart</u>, 142 Fed. Appx. 716, 731 (4th Cir. 2005) (unpublished). In <u>Goad v. Astrue</u>, Civil Action No. 1:06-

00870 (S.D. W.Va. Mar. 7, 2008)(J. Faber), this District Court held that specific reasons however, need not be stated when an ALJ dismisses lay testimony that merely repeats the claimant's allegations, which were discredited.

Claimant's brother, Brian Rider testified at the administrative hearing and essentially repeated Claimant's allegations and testimony. The ALJ determined that his testimony was "of limited value" because it was "no more than a parroting of the subjective complaints already testified to and reported by the [C]laimant." (Tr. at 25.) The ALJ questioned the reliability of Claimant's credibility. (Id.) Accordingly, limited weight was assigned Mr. Rider's testimony. In view of the holding in Goad, the undersigned finds that the ALJ's assignment of limited weight to Mr. Rider's testimony, without specific reasons, was supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 13.), **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 14.), **REVERSE** the final decision of the Commissioner, **REMAND** this matter pursuant to sentence four of 42 U.S.C. 405(g) for further administrative proceedings to reassess Claimant's physical RFC in light of the severity of his COPD as indicated by the results of the PFTs and Mr. Hoggatt's treatment notes, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings

and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: February 1, 2016.

Omar J. Aboulhosn
United States Magistrate Judge